May it please the Court, I am David Shilton. I'm here representing the United States Forest Service. I plan to try and reserve about four minutes for rebuttal, and I'm also going to cede four minutes to Mr. Horngren, representing the interveners. The District Court here set aside a Forest Service decision which approved the Five Buttes Project, which proposes thinning treatments of various types in the Deschutes National Forest. The primary dispute in this case involves the authorization of thinning within a late successional reserve, created by the Northwest Forest Plan. The purpose of that thinning is to maintain and enhance the late successional character of that reserve, primarily by reducing the risk of catastrophic fire. How great is the risk? It's very great. The Davis fire, is that what it was called? Yes. That seemed like a pretty significant fire. It was a significant fire, and it was in terrain that's very close to what is left. But let me ask you this. How often do we see fires like that in the Deschutes National Forest? They've gotten more frequent, unfortunately. How often is more? Is it like once a decade, once every five years, once a lifetime, once every hundred years? The EIS mentions two or three other fires that have happened, I believe, within the last decade. And so that, I think, indicates that this vegetation has gotten so thick in this area that the fire risk has increased over the historic standards where there were frequent small fires. In any of the documents, is that statement evaluated? No. The evaluation here was based on the Davis fire and on the model that the Forest Service uses in these cases, the plan. But it assumes a certain amount of risk, right? It's just always a certain amount of risk. That's what I'm trying to ask you. How is that risk? The risk here is- The risk, the potential for risk is what seems to justify what you're doing. We don't know what the risk is. Well, the EIS states that the risk is high. And where does that come from? I mean, what's high, medium, or low? Is high mean every 10 years? Does high mean fairly, you know, every 20 years? It's not defined in those terms. It's defined in terms of the mix of vegetation. Because in the Forest Service's experience, it understands that where you have stands that are multi-storied stands with a lot of intermediate and small trees and very thick canopies, that the risk that a fire will get up into the canopy and spread rapidly. Exactly. But that's the real disaster, is when you get a fire into the canopy, it moves very quickly, as it did in the Davis fire, and is very destructive, very hard to stop, and it's dangerous. And so the risk is basically presented by the type of vegetation that's out there. And I don't think there's any dispute that this very thick, multi-story forest presents a high risk. The problem here, the nub of the problem, is that's also the type of forest that the northern spotted owl likes for nesting and roosting. And so the problem for the Forest Service is it's got to figure out how to preserve some of this nesting, roosting, foresting habitat, this very thick forest for the owl, at the same time protect it from these fires by making sure that there's not a big block of contiguous, multi-story forest, which is where you have the real danger, because then you can't stop a forest fire once it starts. So it came up with this strategy where they would thin pieces strategically that would protect the spotted owl home ranges, leave those thick, as the owl likes it, but put some areas around it that are thinned, so that they're still late successional forests. They don't have all the multi-layered forest, and the canopy is somewhat thinner. I want to try to make sure I really understand this, because there's always a lot of documents in these cases, and there never seems to be enough time to read everything with the kind of detail that I would like. But as I understand this, we're dealing with a late successional forest, right? Right. Under the Northwest Forest Plan, knocking down these big trees, these old-growth trees, is really the exception. It's not something that's to be done, correct? It is the exception. Right. And the forest plan does provide for an exception. Right. Especially east of the Cascades. Right. Right? And that's where we are. That's where we are. And they set some criteria that the Forest Service should look for if they're going to go ahead and work in these old-growth areas, correct? Correct. Okay. It must clearly result in greater long-term... Right. There's three criteria that it's supposed to look at and to see if they are satisfied here. Right. Now, as I understand it, the plaintiffs really take issue with the one criteria that says the proposed management activities will clearly result in greater assurance of long-term maintenance of habitat. And what they say is, as the reports, as the ESI and whatnot and the decision of record show, is that in carrying out this project, the habitat of the spotted owl is going to be significantly degraded. And so the State Department has said that the State Department has said that the State Department will only have left or I think it was forestry, foraging availability. Right. Is that right? And let me make two points about that. The only reference to significant degrading is a page in the record of decision, which is talking about the issues that have been raised. If you go back to pages, I think it's 19 and 20 in the record of decision where they make their findings. They don't talk about significantly degrading because what they find is that by treating some stands so that they're no longer nesting, roosting, foraging habitat, they are still foraging and dispersal habitat. The owls can hunt there. They can disperse there. And they gradually grow back into nesting, roosting forest. Now, they say, well, yeah, that's correct, but it's going to take decades. Well, they say two to five, you know, 50 years, two to five decades it's going to take for that forest to come back. And on a forest scale, that's not a terribly long time. They're still leaving a lot of good nesting, roosting and foraging habitat. They're just protecting it by thinning these areas, and they'll gradually grow back. And so it's a long-term strategy. Well, the question I really want to get to is, okay, so I start out with the risk. What's the risk? And then we have the – I'll call it – I won't call it significant degradation, but I'll call it significant – I'll call it just degradation of the habitat for the spotted owl. Now, it seems like the risk – reducing the risk is pretty much what's just overriding the degradation of the habitat for the – for the owl. It's really not. The record – And what they say is you haven't really – you haven't really analyzed and balanced, you know, these competing – I wonder if I can just interrupt here for just a second. I'd like to switch the emphasis a little bit. Our court for decades was acting like a bunch of scientists, and we were going to second guess the Forest Service on pretty much everything it did. And we decided a little over two years ago, Lands Council versus McNair, in which we found that reversal of the Forest Service's determinations would be reversed only, and I'm quoting, if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offer an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Now, as I've gone through this record, the original plaintiffs in the action, who are always excellent lawyers, have raised scores and scores and scores and scores of complaints and problems. The agency, as is almost always the case, has spent years and years and years responding to those. But under Lands Council versus McNair, unless there is a finding of the nature that I mentioned, doesn't the Forest Service win in the case? It does, and so I think that poses the question. When the Forest Service found that this project will clearly result in greater assurance of long-term maintenance, that's a prediction, and McNair says that those predictions by the expert agency get a lot of deference. Did it overlook any important factor? Well, it considered the impact on northern spotted owls, including the impact of reducing some areas, the EIS call it, conversion from nesting, roosting, foraging, to dispersal and foraging habitat. Isn't the main concern here these catastrophic fires that have occurred summer after summer after summer where millions of acres are burned because you've got heavy top layers, you've got a big buildup of fuel down below that's never removed, never harvested, so when fires inevitably happen because of lightning and the like, you get these fires that simply cannot be stopped, that not only destroy the habitat of the spotted owl, but everything else in huge areas, and isn't that what the Forest Service is trying to prevent? That is the primary concern, and whereas in some cases you might just have to look at models for assessing that risk, here it's almost as if a model were run on the ground with that fire. You know how fast the fire will travel because you saw it. So it's – that makes it a very strong case, I think, to show that this action is clearly needed and supports the Forest Service's findings on those three factors. Right. Let me just – so, you know, Judge Smith has an excellent point, which is that we're not scientists, and I'll be the first to admit that I'm not a scientist, especially with respect to expertise, scientific expertise with respect to the – how you maintain forests. But I can read these rules, and I can read the forest plan, and I can read the final environmental impact statement and all the other documents that are in the decision – in the record of decision, and we still come back to the criteria for taking this kind of – undertaking this kind of project in late successional reserve areas. And you still have to satisfy the exception to be consistent with the plan, correct? That's correct. So I only went through the first one. But the other one that gives me considerable concern is the last one. The activities will not prevent the late successional reserves from playing an effective role in the objectives for which they were established. And the one reason why we may – why the forest plan recognizes the need for these late successional old-growth forests is to maintain the habitat of spotted owl. So how does this particular project carry out this one criteria that is – that the Forest Service must meet? The Forest Service finds that the project will protect that habitat that the owl needs by reducing the risk of fire and by – It could destroy the habitat in order to protect. The Northwest Forest Plan itself recognizes that sometimes the Forest Service will have to carry out just that balancing. Sometimes it will have to modify spotted owl habitat in order to give greater overall protection from fire and insects. And that's why it provided this exception on the east side of the cascade. So the mere fact that spotted owl habitat may be modified for a period of time does not make for an inconsistency with the plan. If I may just speak briefly to the cumulative impacts discussion. I think here, again, this is a situation where after the case was briefed below and the law has been clarified quite a bit, where it was clarified with McNair on the Northwest Forest Plan issue, on cumulative impacts, this court's decisions in League of Wilderness Defenders versus Forest Service and Ecology Center versus Castaneda have adopted the approach that was taken in the 2005 Council on Environmental Quality Guidelines. And those are the guidelines that this EIS used to assess cumulative impacts. And those guidelines say you don't have to do a detailed historic catalog of every project. You just have to put in the inputs so that you know what the condition is on the forest and the- But let me ask you, which of our cases have dealt with a project of this nature in a late successional reserve in the Northwest Forest Plan area? I don't believe any of them. This is the only one, right? Yeah. McNair didn't deal with that. Right. And McNair, though, dealt with the question about consistency with a forest plan. Yes. But it was a similar situation. You have the flammulated owl rather than the northern spotted owl. But, again- We're still in the old forest growth areas. Right, right. Which the Northwest Forest Plan puts way up there. Right. It does, but it allows the fitting in where the Forest Service makes these findings. And those findings are within its expertise, and that's why it falls within McNair. Thank you, Your Honor. One quick point. First, on your issue of risk, there is a huge risk on the Deschutes National Forest about losing the habitat to the spotted owls and the critters that depend on late successional forests. But scientifically, let me ask you. I'm telling you, I'm not a scientist. Maybe you are. You work with this all the time, and you probably study this, and you work in these cases and whatnot. But short of the forest, you know, the flags, you know, the red flag and the yellow flag and a white flag and all that that they use, how do they assess risk of a major forest fire like the Davis Fire? They assess risk by measuring the weather, historical weather patterns, by looking at the trees and the tree rings and seeing where fire has burned in the past. And in this particular area, more recent history, excerpt of record page 130 in the EIS of 119, since 2003 on the Deschutes National Forest, 16 of the 42 owl home ranges on that forest have been lost. And they have been lost because of fire, not because of harvesting. That's a full 37 percent lost because of fire. And these managers in this room have said, we've got to address that. We just cannot turn a blind eye because we're losing the habitat that we're needing to support. And in terms of your specific question on fire weather issues and risk, in the excerpts of record at page 91 and 92 in the EIS 8081, they go through the different risks of fire based on the types of vegetation, the weather and the return intervals. And so they took a very hard look at that in this case. And I would like to conclude by urging the Court that this is a case where the plaintiffs in the district court couldn't see the forest for the trees. And I urge you to look at the forest for the trees. You need to evaluate the Forest Service decision considering the landscape scale, not just the treatment on a particular acre of habitat. The Court erred in applying a narrow perspective. We're dealing with a much broader area than just an acre of habitat. That's absolutely right. But the plaintiffs in the court would just say, well, you look at this tree. It's cut. Well, it's irreparable here. But we're dealing with a late successional reserve on ER 124. It lays it out very nicely. That's 8,000 acres in size that has nesting, roosting, foraging habitat where they plan to commercially cut of that nesting, roosting and foraging habitat 618 acres out of a commercial project of 4,000 acres. And what they intend to do there is by doing that, and I'd urge you to look at ER 104, they did an analysis with the spotted owl home ranges, locating the units in areas to minimize the spread of the fire to protect these particular home ranges. And so we believe the record here supports the Forest Service decision because of the landscape scale approach that they took rather than just focusing on the individual acres. Thank you. And I'll make sure counsel gets some time for rebuttal. Good morning, Your Honors. May it please the Court. My name is Dan Cruz. I'm representing the plaintiffs in this case. I'd like to start by responding, Judge Piaz, to your first question. How great is the risk of the fire? Well, I'm not talking about any fire. I'm talking about a fire like the Davis fire, which is apparently what prompted the project. That's correct, Your Honor. And that burned 27,000 acres. Yeah. I'm sorry? It burned 27,000 acres. The Davis fire did? Yes, it did, Your Honor. Right. And the Forest Service used that information. As counsel said, they analyzed the risk of fire throughout the project area in excerpts of record pages 91, 92 through 95. Their specific finding on page 95 is that due to current fuel loadings and fire regime condition classes throughout the five-use project area, much of the landscape is classified as a moderate to high risk of experiencing a problem fire similar to the Davis fire. But the problem, as I understand it, is if they don't do anything and the forests continue to age, the fuel loads will continue to build. And if another fire gets started that is like the Davis fire, there isn't going to be any way to stop it. It's going to be the Yellowstone fire all over again. Isn't that what the Forest Service is worried about? That is what they're saying, Your Honor. And they have a number of options to deal with that risk. Only one of them includes logging old-growth trees within an old-growth reserve. But we're talking, what, 644 acres out of how many thousand acres in this particular forest? That's correct, Your Honor. And yet the district court issued an injunction stopping everything. And while we're on the district court, could you help me? At page 8 of the court's opinion, he says in looking at the Northwest Forest Plan guidelines, Judge Hogan concluded that the proposed management activities to, quote, clearly result in greater assurance of long-term maintenance of habitat, end quote, that the findings in the ROD are not strong enough to meet this standard. And the question I'm asking is what standard of review was the district court applying here? Was it the standard of review that Judge Smith cited in Land's counsel? Or is Judge Hogan treating this like he's reviewing a petition for review of an agency decision and deciding whether there's substantial evidence to support the decision? Judge Hogan did not act as a scientist, nor did Plaintiff's ask him to in this case. Taken in just that sentence, the findings in the ROD are not strong enough, it would appear that Judge Hogan might not have applied the wrong standard. I'm sorry. Might not have applied the right standard. Just keep your voice up. Sure. I apologize. You can't let any of the trail off. I'm going to point this closer to my face as well. What the district court did was look at the facts found and the conclusions made. In this case, the facts found in the environmental impact statement and the record of decision, the facts found by the Forest Service are that the treatments proposed in the Five Heats Project within old-growth forest habitat within the old-growth reserve, that those treatments may cause long-term degradation and modification of that habitat. What do you mean by long-term? I mean, we've heard two to five decades.  Is that barred by the Northwest Forest Plan? Well, the Northwest Forest Plan requires the Forest Service to find that the Five Heats Project, at least those activities proposed in older stands in the late successional reserve, will clearly result in greater assurance. Eventually. Eventually. But it doesn't have to occur immediately, does it? We had that very issue in Lands Council versus McNair, and in other ones. You know, as I look at what Chokin did here, I mean, this is basically as if McNair didn't even exist. He's just going back to the old standard of just sitting down and saying, well, if I were the Forest Service, I don't know why I'd do this. I think I don't agree with them. That's not the standard, is it? It is not, Your Honor. Okay, so you agree with that. So if you look at this concept that the Forest Service, which is charged with protecting, keeping our forests, protecting these animals and so on, sees these devastating fires. I think we heard testimony a few minutes ago that 16 of 42 spotted owl habitats in the And yet you seem to be saying that, you know what, this line over here and this line over there and that line over there, I don't like the way they interpreted that. So let's just not do anything. Let's just wait and see whether we get a fire. And we're going to have the district court determine that, not the Forest Service. We're the experts here. Isn't that the very kind of thing that Lands Council was designed? Remember, it's a unanimous en banc case, unanimous en banc case. It's spoken more clearly about this issue than anything else this Court has done in 20 years. But this Court seemed to have ignored it. And I want to be sure that we have a clear understanding, at least as between you and me, that what we had here was the same old pick-it-apart kind of deal. I want to know specifically what the district court found was legally wrong, not his role as a scientist, not his view of the record. What did they fail to follow in terms of the Northwest Forest Plan? What did they fail to include in their analysis in NEPA? That's what I want to know. Okay. First, I would wholeheartedly acknowledge that the deferential standard of review of the Administrative Procedure Act, as explained by Lands Council v. McNair, applies here. And I think plaintiffs have been very careful to frame their arguments within that deferential standard of review. And I'd like to point the Court to a few examples of where, in determining consistency with the Northwest Forest Plan, the Forest Service failed to consider important aspects of the problem and offered explanations that run counter not just to the evidence before the agency, but run counter to the evidence developed by the agency. Okay. Now, when you say run counter to it, obviously there are contradictory evidences that are brought in. That's part of the role. And under Lands Council, as long as the Forest Service addresses them and makes a decision as between these competing interests, that's okay, unless there is a specific law that says you cannot do that. That's right. Do you agree with that analysis? Yes. And that failure occurred here with the Forest Service, with the fact that the Forest Service ignored entirely, fails to acknowledge the existence of, in the entire environmental impact statement, the evaluation of their own experts showing that logging outside of spotted owl habitat could not only significantly reduce the risk of a wildfire, but could reduce the risk to a greater degree than what's proposed here. The Ager et al. study is in the record. It was put there by the Forest Service. Is that the 44% versus 47% reduction? That's correct. What Ager et al. said is that by treating stands outside of spotted owl habitat, they could reduce the risks by 44% when compared, I think, to 40% under the alternative. That's correct. And so when plaintiffs received the administrative record for this case, they saw this study for the first time. It's not mentioned in the environmental impact statement. It's not acknowledged by the Forest Service. The Forest Service had experts analyzing the Five Geats Project area for the specific point of determining whether or not activities could be focused outside of spotted owl habitat and still result in a significant reduction of the risk. Those experts found that it could. And despite that evidence, in the record, developed by the Forest Service's own experts about this project, there is no mention of it in the environmental impact statement. But in terms of the injunction that you obtained, the Forest Service couldn't even permit operations in those areas, could it? I believe the district court enjoined the entire timber sale because the district court also found violations of the national law. It didn't enjoin just the entire timber sale. It enjoined all of them. I'm looking at page 12 of the Court's order. It enjoined the defendants from implementing any portion of the Five Geats Project still remaining. That's right. And still remaining, I just want to explain. I'd like to explain what still remaining means, is that while the district court decided this decision, two of the seven portions of this project were implemented and completed. And so there were a substantial amount of activities that did happen, and the district court enjoined only those that were remaining. Well, I guess maybe that answers the next question, which is how does this comport with what the Supreme Court has told us in Winter on the scope of these environmental injunctions? Yes. First, the plaintiff's NIFMA claim under the Northwest Forest Plan is specific to the late succession reserves. That is clear. However, plaintiff's claims under the National Environmental Policy Act attacked the Forest Service's environmental impact statements, which applied to the whole area. So when finding that the Forest Service violated NEPA and the district court had the authority to enjoin the timber sale as a whole, I think this case is somewhat distinguishable from Winter because Winter was about a preliminary injunction and this is a permanent injunction. This is following a summary judgment ruling. That's right. And the Administrative Procedure Act says that once a court finds that the agency acted arbitrarily and capriciously, it shall set aside that action. That's exactly what the district court said. So you would say Winter doesn't control and to the extent that the Supreme Court said that the courts have to consider more specifically alternatives, including narrowing the scope of the injunction, that's not applicable here? Well, the court can – it should consider those, but it has discretion and this Court reviews that decision in the review subscription. Where would I see that discretion exercised, though, in the face of the district court's language that I just read you? After the district court made its decision, the Forest Service and the interveners in this case petitioned the court to limit the injunction. And he reviewed. And he reviewed it and we argued it and the court decided to limit the injunction in precisely the way that the Forest Service asked for. And so that – the claim – This was a final permanent injunction, not a preliminary injunction. That's correct. And so the test for a permanent injunction requires the court's – I'm sorry. The test for a preliminary injunction requires the court to decide whether there's a likelihood of success on the merits and balance that against the harms of the different parties. Here, the district court decided on summary judgment that the plaintiffs prevailed on the merits, not – But if the district court applied the wrong standard, going back to my first question I asked you, then shouldn't we dissolve the injunction and then reverse and remand for the district court to apply the correct standard? I don't believe the district court did apply the wrong standard. The district court has discretion. It considered arguments from both sides about the harms and the benefits of treatment, and it decided, despite those arguments, in its discretion, to enjoin the remaining portions of the 5-eats project. No. I'm sorry. I was going back to the earlier question I asked you in regard to the characterization of the administrative agency's decision that there wasn't enough evidence to support  If that's wrong, if he applied the incorrect legal standard, then he should not have entered summary judgment and, therefore, should not have entered an injunction. This Court can uphold the district court's decision on any grounds. And I think while Judge Kagan – But I thought it was black letter law that if the district court had applied the wrong standard, and that's the basis for entering summary judgment, how can we affirm on a different ground? Well, the district court did not apply the wrong standard. The district court looked at the facts found by the Forest Service, which were that this project may cause long-term degradation of habitat, and applied those to the – and contrasted those with the conclusion made that the 5-eats project will clearly result in greater assurance of long-term maintenance of habitat. Well, what he said was he didn't think there was enough evidence to support the Forest Service's decision. And I – are you arguing that that's just a shorthand for – and, therefore, their decision was arbitrary and capricious? That's correct. I believe the district court did articulate the arbitrary and – the deferential standard of the – Well, he cites to – I mean, he cites to Lance Counsel v. McNair, but the question is, did he apply it? And that's the problem I'm having. I can't tell from – He did. And he may not have been as heartful about it, but he – looking at the opinion, he looks at the facts found and looks at the conclusions made. And when they don't line up, the agency acted arbitrarily and capriciously, as was discussed in Lance Counsel. And I realize that this, I think, occurred after the Court acted. But the League of Wilderness Defenders v. U.S. Forest Service on the cumulative aggregate effects analysis, which was the primary gravamen of your complaint in NEPA, the Court clearly based its analysis on that issue, which has now been overturned, has it not been? No. I don't think the League of Wilderness Defenders overturned prior cases talking about it. No, but what it did was that it found that the Forest Service analysis, the approach that it took, was consistent with the language of the regulation and therefore appropriate. And the district court found that that wasn't correct. Isn't that right? The district court found that the Forest Service had failed to provide quantified and detailed information. But it didn't go into enough detail about all the past and so on. That's correct. In the League of Wilderness Defenders case, we had the same kind of thing. People wanted to go back to before the Indians and have a modeling of what it would have been like then and going forward. And we said that wasn't necessary. Well, that's not at all what plaintiffs are asking for here. League of Wilderness Defenders said that the agency may aggregate its cumulative effects analysis, but that analysis must still be based on quantified and detailed information. And here, again, the Forest Service aggregated its analysis, and it's entitled to do that. But where the agency acted arbitrarily and capriciously is where they failed to include the relevant timber sale inputs of past projects, whether on an incremental or aggregated basis. There's no quantified or detailed information. For example, there's nowhere in the environmental impact statement that says how much old growth habitat has been logged in this area. And where the agency is actively removing old growth habitat for the purpose of reducing the risk of fire, they need to know how far back they've come already. Because there may become a time when, even in face of the risk of fire, it's not okay to remove 2,000 acres of old growth forest habitat. The agency can decide that. They have deference to come to that conclusion. But it has to be based on a hard look at the facts, a hard look at the impacts of past actions based on qualified and detailed information. And who decides which facts they have to look at? I think ultimately How far back do they have to go on the cumulative analysis according to your reading of the case? I think in this particular example, they have to where the record says that they have extensively clear-cut the area since the 1960s, it would be very helpful to both the public and the decision maker to know how much old growth habitat was lost since the 1960s. They don't have to go into every individual action. I understand your perspective. That's what you would like to see. But under the regulations and under the League of Wilderness Defenders' case, is that what the Forest Service has to do? As long as it explains its rationale, it explains why it does what it does, and it doesn't violate any express regulation, don't we owe them deference under that case? Well, the regulation expressly states that they have to consider the cumulative impacts. I understand that. But I'm just saying that case interprets, basically interprets and construes the Forest Service's use of that regulation as being appropriate. And that's what they did in this case, I believe, is it not? Well, no. Well, this is similar to League of Wilderness Defenders. And in League of Wilderness Defenders, the Court specifically held that the cumulative effects analysis was insufficient. It said despite the fact that we give deference to this aggregation method, we hold that the cumulative effects analysis is insufficient because it fails to include the relative timber sale inputs. Right. And so here, the general vague and perfunctory statements about past clear-cutting on all the buttes and mountains and extensive clear-cutting throughout the area are precisely the type of vague and perfunctory statements that have been rejected by the circuit. So from your perspective, the League of Wilderness case itself refutes what the Forest Service is saying. That's correct. The League of Wilderness Defenders and Ecology Center v. Castaneda both reaffirmed the requirement that quantified and detailed information be not just somewhere in the record in a watershed analysis or somewhere else, but in the environmental impact statement. And that's precisely the type of information that was left out of this analysis. Why don't you – I want to go back to the Northwest Forest Plan for a minute. And I want you to capsulize for me why this project doesn't satisfy the exception criteria. Yes. To cutting. Because the Forest Service acted arbitrarily and capriciously because their explanations do not – they run counter to the evidence before the agency. There are three specific examples that I'd like to point to the Court. First, and this is what we started with, the explanation for that second test, which is that the activities must be clearly needed, says that – That the activities are clearly needed to reduce risks. Exactly. And the Forest Service explained, and this is at page 197 of the excerpts of record, in a document titled Findings or Consistency, what the Forest Service calls their findings of consistency. They say vegetation management activities are needed because the vegetative conditions in the project area are such that the risk of more large-scale loss of large trees and late structure is extremely high. They say the risk of a problem fire is extremely high, and they repeat this – the Forest Service repeats this several times in their brief, and they repeated it to the Court today. However, the record, excerpt page 95, in the body of the EIS itself, the Forest Service states that the risk of a problem fire is moderate to high. So on one hand, you have a factual finding that the risk of a problem fire is moderate to high. The agency explains its conclusion that there's a clear need to reduce risk because the risk of a problem fire is extremely high. What about bug infestation? I thought they also cited to the pervasive problems of the western pine bark beetle. They do not cite to that in their findings of consistency. On the particular issue here, whether the activities are clearly needed to reduce the risk, they talk about the Davis fire, that there's an extremely high risk of a problem fire. They do not mention in this particular finding anything about bugs. And the Court's review of the agency's action, the agency's decision can be upheld only on the basis for the reasoning in that decision. They explain in writing here the reasoning for that decision. Well, I'm sure. I mean, I didn't read all 12,000 pages, but I read a fair number, and there's an awful lot of talk about bug infestation. Are you saying that played no role whatsoever in the agency's decision-making? It may have, but discussion of bugs and disease elsewhere on the record does not establish that there's a clear need to reduce the risks. But isn't that a separate risk from fire, I guess, is the question I'm asking. It is. I note that the treatment's- And isn't that a risk that afflicts long-term successional reserve forests? Your Honor, I don't know that the Forest Service made that specific finding on the record here. Well, then why did they talk about bug infestation if it's not a problem? Well, there may be an issue with it. They may think that there is a problem with it, but- I thought the risk they wanted to- they were trying to deal with is the potential for fire, another fire. They say in the environmental impact statement that the placement of the treatment units is designed specifically to disrupt the flow of fire. And so this alternative, while there is-  that helps reduce the risk of bugs, the specific treatments here are designed to reduce- You said you had- there were three. You're going to give me three. That's one. Yes, that's one. The second is the Ager et al. study. In determining that the Five Feuds Project was clearly needed to reduce risk, there is nothing in the consistency determination or anywhere else in the environmental impact statement that says that the team of Forest Service experts analyzed the issue and determined that treatments were not needed in old-growth stands. And Judge Smith, as you said, given conflicting opposing views, the agency is entitled to rely on one over the other, but they have to disclose that. And here they didn't disclose that. The agency is not entitled to reject the opinions of its own experts without at least explaining why. That did not happen in this record. The third point is, again, the contradictory statements between the conclusion, which is that this project will clearly result in greater assurance of long-term maintenance of habitat, and the finding of why they believe that will happen, without ever discussing the long-term degradation and modification of habitat they're expecting to occur actively because of the treatment. You keep talking about long-term degradation, but nobody's answered my question yet. I mean, these are not annual crops we're talking about. These are growing trees and living forests that go on for decades and decades. And we're talking either 20 years or 50 years, worst-case scenario. But, I mean, what's the average age of the forest? I mean, the forest is millennia old. I mean, the forest has been developing with fire for millennia. The standard of the Northwest Forest Plan is that the project must clearly result in greater assurance of long-term maintenance of habitat. So they specifically talk about long-term maintenance. Well, if the forest lives forever, then 20 or 50 years isn't that long a period of time, is it? Except that the Forest Service on the record specifically used the phrase long-term degradation and modification of the habitat. Okay, but what does that mean? Give me a definition of what long-term degradation is. I think 50 years could be long-term. And, ultimately, the Forest Service may have discretion to analyze that. That may be what you think, but where in the record do I find a definition of that term? I don't know that the Forest Service ever defines what long-term is, okay? But at page 301 of the excerpts of record is where the Forest Service specifically says, these activities, the proposed activities, may reduce the quality, effectiveness, and distribution of habitat available to the Northern Spotted Owl in the planning area for the short and long term, as well as directly, indirectly, or cumulatively. But those terms are not defined. That's right, and the Forest Service, if they were to choose to define them, may have deference and may be able to do that. They haven't done that here, and they specifically couch the impacts of the Five Buttes Project in this long-term degradation language. And so, on the record, there's no question that the Forest Service here has determined that those long-term impacts are a possibility. Thank you. Thank you. Several points. First, from the last point just made on long-term degradation, what a plaintiff is citing to excerpts of record 301 is a statement in the record of decision that is under issues raised. And so, that issue was raised of long-term degradation. The Forest Service never found that this thinning would cause long-term degradation. It finds it will simply convert habitat for a period of time. Now, the plaintiff says that one of the things that the Forest Service overlooked was the statements of its own scientists, that you don't need to do thinning in this nesting, and points to the Ager study. The Ager study actually was not published until after the record of decision here. The Forest Service was aware of it, because Ager is a Forest Service scientist. But the Ager study does not suggest that at all. That was simply a study which said, well, let's take a look what would happen if we only thinned in habitat that's not spotted owl habitat. And it found that in order to get the same amount of protection here, you would have to thin in 20 percent of the project area. That is way more than the Forest Service is proposing here. And that study didn't consider whether it was possible to thin in 20 percent of the habitat due to lack of roads, administrative restrictions. It was one study that was trying to make policy recommendations, and the Ager study specifically notes that you can get a lot more bang for your buck, a lot more protection if you do some thinning in the nesting, resting, and foraging habitat. So that does not undercut the Forest Service decision at all. Now, is the decision consistent with the Northwest Forest Plan? The Northwest Forest Plan itself, this is at page 28 of the excerpt of the record, I don't have it here, but it specifically notes that modification of habitat on the east side of the Cascades will be necessary in some instances because you have this situation of dense growth that's not the historic situation that's come about because of fire suppression. It recognizes that you will need to do that. Now, on... Do you agree with the Council's characterization that the bug infestation problem was not a risk that the Forest Service was... No, not at all. Insects and disease was one factor, certainly, that weighs in favor of the project. I think reducing the risk of fires, I would say, the primary goal here, but insect infestation has been a problem. It is a problem with the same cause, that is, the thickness of vegetation. When you have a lot of dense tree stands, they compete for nutrients, and that weakens them, and they are more subject to insect infestation than they die, and they become a fire hazard. So that is another reason why the Forest Service has decided to do this thinning. Where would I find in the EIS, I guess, or the record of either one, with respect to bugs or beetles, that this project would... The project activities are clearly needed to reduce risks. Well, the clearly needed finding at 197 is focused on fires. Yes. The bugs is another reason that supports it. But we're dealing with old succession reserves, and you need to... And when you're knocking down trees in these old-growth forests, in the Northwest Forest Plan, you've got to be consistent with these exceptional criteria. You do. And my answer is that fires are enough. I thought the whole case really boils down to what we're getting at. For those... Fire. For those findings. Mainly because we're dealing with the old successional... All right. So I'm not totally crazy. ER 9184 identifies as one of the public issues, the Five Buttes Project proposes to reduce the risk of large-scale forest loss to catastrophic wildfires and beetle epidemics within the 160,000-acre analysis area. No, that's absolutely true. I think we're just focusing on the three. But the consistency with the plan really focuses on the fire. Right. And those two pages focus on that issue. But I think you can look at the rest of the EIS. If the beetles kill the trees, then they become fuel for the fire. Absolutely. Absolutely. And with respect to cumulative impacts, the Forest Service here did look at the prior sales. And the thing is that the problem here, the thick fire-prone forest is really caused by the suppression of fire. It's not a result of prior sales. They did consider them to the extent that it was helpful, but there was no need to do a very catalog-detailed history. Let me just ask, with respect to the chart, what was it, A? Table 3-1 is a list of the prior projects. Right. Where do we – just maybe in terms of acres, how do you – or trees, where do we – Prior projects. Is there any quantification any place in the – Yes. The EIS does talk about the number of acres that were affected by the prior projects. They are mostly smaller projects. But – and then in the discussion of cumulative impacts, with respect to each resource, it explains, you know, what is significant about those prior harvests to the particular resource. And that's what CEQ says you can do. You can focus on what are the important issues to help the decision-maker make a decision. And it turns out that the prior harvests are not a big driver here. They don't tell you a whole lot about how you should reduce the fire danger, but they do consider them. Yes. The chart itself is on excerpts of record 73 to 74, but throughout the discussion that follows that, you'll see references to those sales, and it includes the acreage of those sales. Okay. Thank you very much. I appreciate your arguments, both sides. Very helpful. Thanks. And very interesting. And the case is submitted at this time, and that ends our session for this morning. Thank you all very much.
judges: Paez, Tallman, Smith M.